**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| POWERHOUSE HILLWOOD HOLDING LLC, | ) | Case No. 1:26-cv-8860 |
| | ) | |
| Plaintiff, | ) | Honorable Sara L. Ellis |
| | ) | |
| v. | ) | |
| | ) | |
| COMMONWEALTH EDISON COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff PowerHouse Hillwood Holding LLC ("Customer"), for its Second Amended Complaint against Defendant Commonwealth Edison Company ("ComEd"), states and alleges as follows:[1]

## NATURE OF THE ACTION

1. This action arises out of a dispute between Customer, a data center developer, and ComEd, the monopoly utility, over the interpretation of a provision of a Transmission Security Agreement approved and made effective by the Federal Energy Regulatory Commission ("FERC") ("TSA"),[2] and ComEd's subsequent efforts to end a major economic development project in Illinois through actions not authorized by the TSA or its Illinois retail tariffs.

2. The TSA is a necessary ingredient for a multi-billion-dollar large-load data center campus Customer is developing in Joliet, Illinois (the "Joliet Technology Center" or "Project") for

[1] On September 1, 2026, the Court granted Customer leave to file this Second Amended Complaint. ECF No. 74. On September 29, 2026, the Court directed Customer to file this complaint by October 1, 2026.

[2] Any terms not defined herein have the meaning ascribed to them in the TSA. Any emphases (bold/italics) to exhibits have been added. Exhibit 1 is the publicly available, redacted version of the TSA on file with FERC. Exhibit 2 is the unredacted version of the TSA.

which ComEd is the sole provider of transmission service.

3. The Project will sit on approximately 795 acres of land in the City of Joliet.

4. The City of Joliet formally approved the conditional annexation, rezoning, and preliminary planned-unit development of the Project site on March 19, 2026. The Project has been embraced by the City of Joliet and its surrounding community as a transformative investment.

5. It is exactly that. The Project is expected to create up to 10,000 construction jobs and 700 permanent positions, and it enjoys broad support of labor and trade union members. The City of Joliet estimates that the Project will generate over $310 million in property taxes over 30 years, with other taxes providing funding of $677 million for the local high school, $76 million for the junior college, and $146 million for the county. The Project sponsors have also committed to fund up to $100 million for community improvement investments in the City of Joliet.

6. The Joliet Technology Center is expected to help "support the community's long-term economic future."[3]

7. The Project is among the largest data center developments underway in the United States. It has been designed with the most modern features to minimize any impact or disruption, including closed-loop/dry cooling systems (which should dramatically minimize water consumption compared to prior designs), facilities built to LEED or similar green building standards, on site stormwater management, and sound management features. It is part of a broader national effort to build the digital infrastructure necessary to maintain American leadership in artificial intelligence and advanced computing. The Joliet community has repeatedly expressed that it believes that it will benefit enormously from being the site for one of the nation's largest data center campuses. ComEd's conduct threatens not only this Project but Illinois's competitive

[3] City of Joliet Approves Conditional Annexation for Proposed Joliet Technology Center Development, City of Joliet, Ill. (Mar. 19, 2026), https://www.joliet.gov/Home/Components/News/News/5666/41.

position in the race to attract the next generation of technology infrastructure investment.

8. The Project is a joint venture between PowerHouse Data Centers LLC and Hillwood Corporation. PowerHouse is a division of American Real Estate Partners LLC that was founded in 2021 and is a pioneering full-service real estate partner for hyperscalers nationwide. From first site to signed lease and from land acquisition and power procurement to capital structuring and leasing, PowerHouse manages the entire development lifecycle for major projects across the country. Today, that represents nearly 10 gigawatts (10,000 megawatts) of capacity in operation or under development across various U.S. markets including Virginia, Texas, North Carolina, Kentucky, Illinois, Indiana, Nevada, and Pennsylvania. Hillwood is a leading real estate investment and development company founded by Ross Perot Jr. in 1988, with decades of experience executing largescale, infrastructure-intensive developments in partnership with public entities, utilities, and major corporate users. Its flagship AllianceTexas development encompasses approximately 27,000 acres in North Texas and has generated more than 73,000 jobs and approximately $142.9 billion in regional economic impact since its inception. AllianceTexas also includes a substantial data center campus and has attracted significant hyperscale data center investment.

9. Projects like the Joliet Technology Center require power. Among the different aspects of power, there is power generation and power transmission. This dispute deals with transmission services, which is the transmission of power over wires from the generation sites to the Project's location. While Customer plans to obtain power independently and separately from ComEd, it is forced to deal with ComEd as the monopoly provider of transmission services to deliver that power to it in Illinois.

10. Because ComEd is the monopoly provider of retail service in this part of Illinois,

the terms on which Customer obtains retail electric service are dictated by ComEd's tariffs[4] on file with the Illinois Commerce Commission ("ICC"). ComEd's Retail Service Tariff is extensive, and it addresses in detail the obligations relating to constructing, invoicing, substantiating costs relating to, and payment for the physical infrastructure that ComEd must build to deliver power to a project like the Joliet Technology Center.

11. ComEd also demanded that Customer execute a security agreement called the TSA.

12. The TSA is a creation of ComEd's parent company, Exelon Corporation. It is not standard across the industry. It is Exelon and ComEd-specific. ComEd presented the TSA to Customer as a standard form agreement, with minimal ability to negotiate its terms. ComEd uses TSAs with other customers, with Customer-specific changes primarily reflected in the Exhibits.

13. The TSA requires that Customer issue a "Letter of Credit," also called "Credit Support." The purpose of this requirement is to guarantee that ComEd will receive a minimum level of revenues from the Customer for at least a ten year term of service.

14. The amount of Credit Support required changes year-to-year. Exhibit C to the TSA reflects a clear chart on amounts and timing.

15. Due to its size and scale, the Project will not be ready for transmission service for several years. This "Commercial Operation Date" is July 31, 2028.

16. The earliest date that ComEd could draw on the Letter of Credit is after this, January 1, 2029 (the "Customer Shortfall Event," discussed further below).

17. While Section 9(A) of the TSA requires Credit Support to be posted as an initial matter within 30 days of the Effective Date, Exhibit C sets forth a Credit Support Schedule starting

[4] The tariffs referred to herein are consistent with the definition in the TSA of the Retail Service Tariff. TSA Ex. A, Definitions at 18 ("'Retail Service Tariff' means Utility's filed tariffs governing the provision of regulated electric utility service, and those State of Illinois laws or ICC regulations and directives that also regulate the eligibility for and the rates, terms, and conditions of such service.").

with "Year 1 – 2029." The Credit Support Schedule set forth in Exhibit C continues for ten years after Year 1.

18. Customer timely posted Credit Support required by the TSA on April 14, 2026.

19. Customer is ready, willing, and able to post the Credit Support required in 2029.

20. Despite the clear language of the TSA and Exhibit C, ComEd has demanded that Customer immediately post the full amount of Credit Support required for 2029. That amount is $586,876,792.

21. Given that a letter of credit is a fully-guaranteed instrument and hardly different than posting cash, this demand would require Customer to lock up more than a half-billion dollars years before commercial operation even begins.

22. There is no language in the TSA stating that the 2029 amount is due in 2026. To the contrary, all aspects of the TSA state that the 2029 amount is due in 2029. ComEd has consistently taken the position that the 2029 deposit is due in 2026. This position is contradicted by the plain, unambiguous terms of the TSA. ComEd has used those same requirements to prevent the Project from moving forward. By demanding nearly $587 million in Credit Support years before Customer is obligated to provide it and ceasing the work necessary to deliver electric service, ComEd has transformed an agreement intended to safeguard against project failure into a tool to bring about that very result.

23. From the first moment that the parties had a dispute, on May 4, 2026, when ComEd sent Customer a notice of default (the "Notice of Default"), ComEd has exercised extra-contractual self-help remedies to destroy the Project. The last uncontested status quo[5] is the day before, May

[5] As the Court explained during an August 5, 2026 hearing, the "status quo is the status quo before ComEd cancelled anything" "before anything went down, we want to preserve where everybody was so we can figure it out." Ex. 5, Aug. 5, 2026 Hr'g Tr. at 26:17-23, 27:3-7.

3, 2026. This is the moment to which Customer seeks to return the parties. ComEd should be required to meet its ongoing contractual obligations.

24. ComEd stopped performing under the TSA, in violation of its obligations thereunder, by no later than May 4. The Notice of Default did not merely declare a default. In the same instrument, ComEd announced it was: "(1) cancelling all project activities, including engineering, and (2) cancelling the [redacted] purchase order for breakers by end of day on May 5, 2026."[6] The Notice of Default is attached hereto as Exhibit 3. ComEd did this despite the fact that Section 24 of the TSA requires a dispute resolution process, which Customer invoked and the parties thereafter completed before Customer brought this suit.

25. Under the TSA, the parties can only exercise remedies "at law or in equity under this TSA, including the initiation of court proceedings" after the dispute process period. ComEd instead took a series of immediate steps to coerce Customer, harm the Project, and avoid the review of any court or neutral arbiter. ComEd's conduct has only continued and escalated since this time.

26. On May 15, 2026, ComEd sent Customer a letter attached hereto as Exhibit 4 where ComEd demanded an "increase" in its Retail Service Tariff deposits in light of the TSA dispute. Customer requested information necessary to substantiate the amount and treatment of the requested deposits and made clear that it was prepared to provide appropriate security. ComEd nevertheless tied the additional retail deposit demand to the parties' separate TSA dispute and threatened consequences not provided for in the Retail Service Tariff if Customer did not comply.

[6] Despite Customer's requests, ComEd only provided this purchase order after the litigation was filed, when the parties were negotiating a standstill agreement. Ex. 6 (filed under seal). Even then, the purchase order ComEd shared was "Revision 002" printed on June 3, 2026. The delivery date in the order is November 25, 2030. On information and belief, this revised purchase order further evidences ComEd's unilateral decision to stop performing under the TSA after May 4, 2026. Based on ComEd's representations before FERC, and on information and belief, ComEd has since cancelled the [redacted] contract during the pendency of this litigation. Customer is able to procure its own gas-insulated substation industrial circuit breakers so that the Project may nonetheless proceed.

This was a backdoor way to seek additional security deposits in a manner not provided for under the TSA Credit Support requirements by using ComEd's Retail Service Tariff as a means to breach the TSA. This was improper conduct and a breach of the TSA. By doing this, ComEd set a calculated trap and presented Customer with a false choice: (1) Customer pay an additional $26.45 million in deposits -- but because Customer's refusal to pay the 2029 Year 1 Credit Support was a breach and "if [Customer] remains in breach of the TSA," meaning does not post the 2029 deposit immediately and prematurely – then ComEd would "terminate" the Project and "draw upon" the $26.45 million; or (2) if Customer did not pay the additional $26.45 million (which ComEd would have taken), then ComEd would use that failure as tan excuse to cancel the Project. Trap choice (2) is exactly what ComEd did.

27. ComEd failed to comply with its own obligations and continue to perform and deliver all necessary and proper information for Customer to evaluate the additional deposits. ComEd instead used its power and monopoly status in an attempt to coerce Customer and as a tool to breach the TSA. ComEd also refused to provide information reasonably requested by Customer concerning the basis, calculation, procurement commitments, and proposed treatment of the additional tariff deposits.[7]

28. ComEd failed in multiple other respects. It failed to use commercially reasonable efforts to meet the requested Commercial Operation Date and Load and Phasing Schedule. It refused to meet with the City of Joliet, as necessary and required by the TSA, to move the site plan approval process forward for the Project. It failed to provide information that would allow

[7] ComEd's conduct is also consistent with concerns identified in a recently-released audit report issued to the ICC, dated August 24, 2026, concerning ComEd's administration of its Rider NS tariff. Exhibit 7. The audit identified tariff-administration deficiencies and irregularities that bear notable similarities to Customer's experience here. Customer likewise alleges that ComEd failed to administer its Retail Service Tariffs according to its terms and imposed requirements and consequences not authorized thereunder.

Customer to check the substantial deposit and equipment amounts, to understand the calculations ComEd used to determine the Credit Support requirement in Exhibit C, or nearly any other customary information that is required for a project of this magnitude.

29. On information and belief, around the time of the Notice of Default, ComEd carried through on its threat to cancel the long lead equipment orders and later, perhaps recognizing the error of that decision, requested a revised a purchase order for long lead material, revising the delivery schedule so that it was two years, three months and twenty five days after the Commercial Operation Date. That was well after the required timeframe under the TSA. This is based on ComEd's threat to cancel the long lead contract on May 4, 2026, and the text of the only purchase order disclosed to Customer to date: a vendor purchase order dated June 3, 2026 and is labeled "Purchase Order Revision".

30. Tellingly, on July 1, 2026, ComEd ultimately provided limited materials. Exhibit 8. Without explicitly flagging such an important development to Customer, one attachment to an email revealed a 22-month delay to the Commercial Operation Date of July 31, 2028, with full installation and commissioning not forecast until 2031. This material delay, on information and belief, was caused by ComEd's improperly stopping performance in breach of the TSA. Further, also on information and belief, such cessation of performance was done in retaliation for Customer's enforcement of the TSA.

31. This pattern of intimidation and self-help continued throughout Summer 2026. Customer filed this suit on July 20, 2026, seeking an orderly and impartial determination of the meaning of the Credit Support provision in the TSA. Rather than allowing a Court to resolve the parties' dispute, ComEd took further actions with the intent of destroying the Project. ComEd took each of these actions with full knowledge of this lawsuit and the relief sought therein, which

was to preserve the status quo. These actions were further breaches of the TSA aimed at putting Customer and the Project in a position that would not be possible to remedy.

32. ComEd's actions have caused substantial harm to Customer. For example, instead of a Commercial Operation Date of July 31, 2028, ComEd represented on the record to this Court that the "earliest possible date" ComEd could provide service was now 2031.[8]

33. Although ComEd ceased performance under the TSA in May 2026, on July 24, 2026, ComEd further confirmed to Customer that it was unilaterally "terminating the TSA and cancelling the Project," effective immediately. Exhibit 9, July 24, 2026 letter. In the same letter, ComEd purported to cancel Customer's retail service application submitted in 2024 (the "Application"), stating that it would "cease further work on the Project, including cancelling all future project status meetings and long lead material orders." *Id.*[9]

34. The same day, ComEd filed a Notice of Cancellation of the TSA with FERC with an "as of" date of July 25, 2026. ComEd did this despite knowing that the cancellation would not be effective unless FERC agreed with ComEd's argument (which FERC ultimately did not) and only after FERC acted upon it after a procedural review. FERC's regulations contemplate a 60-day notice period before any cancellation would be effective. ComEd stated that it was cancelling the TSA because it had cancelled the underlying Application (the same reason rejected by FERC for Red Energy, see *supra* footnote 9) and "for [] failure to provide the required credit support."

[8] Ex. 10, Aug. 28, 2026 Hr'g Tr. at 50:3-15.

[9] Customer holds all right, title, and interest in and to the Application and any rights and claims thereunder. The Application is attached hereto as Exhibit 11. Nothing in the TSA requires an application for Customer to receive retail service. A recent FERC decision concerning a materially identical TSA highlights the independence of a valid TSA from a pending application. In *Commonwealth Edison Co.*, 196 FERC ¶ 61,211 at P 6 (2026) (*Red Energy*), FERC considered a ComEd effort to cancel a TSA '"because the underlying retail service application has been cancelled.'" *Id.* The petition was unopposed. *Id.* FERC rejected ComEd's request because it could not understand "why cancelling the [TSA]" is appropriate in light of the retail service application cancellation, "such as by identifying a provision of the [TSA] to that effect." The TSA there is materially identical to the one here. *Id.*, Ex. 12, Red Energy TSA.

The Notice of Cancellation is attached as Exhibit 13 (publicly available version). On September 22, 2026, FERC rejected the Notice of Cancellation and declined to exercise primary jurisdiction. Exhibit 14, FERC Order, ¶¶ 28-29; *id.* at 11-12. The TSA remains in full force and has not been cancelled.

35. ComEd further engaged in improper communications with third parties falsely representing that the Project was already cancelled, contacting the Mayor and City Manager of Joliet; state representative Larry Walsh; the Data Center Coalition; and Labor Local 150.

36. Customer needs to resolve this dispute now to move forward with the Project, to the extent that is still possible to do so on a timely basis in light of ComEd's conduct. The parties have been unable to resolve this dispute on their own. There is no substitute utility that can transmit power from the grid needed for the Project; ComEd is the monopoly transmission provider. The Project's viability and place in the interconnection and service queue and cluster study process depend on the already-established timeline and load ramp schedule that are unique to this Project.

37. ComEd's actions have already caused significant harm to Customer. By this action, Customer is seeking declaratory, equitable, and injunctive relief to preserve any irreparable harm to the greatest extent possible. As set forth below, however, Customer is also seeking damages: (1) for the harm that has already occurred, that cannot be remedied sufficiently by injunctive or equitable relief; and (2) to the extent it becomes impossible to preserve the Project as agreed and contemplated in the TSA because of ComEd's breaches and interference with the Project, to redress the substantial losses caused by ComEd's wrongful conduct.

38. The Joliet Technology Center is a substantial and exceptional Project. Customer has worked for years to locate a perfect location, a welcoming community, a viable and convenient

building site, and willing and capable users to be the tenants. In today's climate, this is both extraordinarily valuable and exceedingly rare.

39. If Customer is not able to salvage -- albeit with substantial effort and expense -- the Project, then it will be not be just a loss for Customer and its end users, but also a significant loss for the Joliet community. ComEd has caused the potential destruction of a multi-billion dollar enterprise that Joliet and its surrounding community had embraced.

40. ComEd's monopoly status carries with it heightened obligations to deal fairly with customers who have no choice but to rely on it. Yet ComEd used its position as Customer's monopoly utility provider to attempt to compel Customer to provide security on a timeframe Customer alleges the TSA does not require and, when Customer sought judicial relief, took actions to threaten the continued viability of the Project, to retaliate against Customer for exercising its right to seek judicial relief, and to destroy a multi-billion dollar project and the thousands of jobs and billions of dollars in community investment that come with it. A monopoly utility that enjoys the exclusive privilege of providing an essential public service should not be permitted to wield that privilege as a weapon against the very customers it is obligated to serve.

41. Customer respectfully seeks: (1) a declaration that the $586,876,792 amount of Credit Support is due in 2029, and, thus, Customer's issuance of Credit Support for 2026 complied with the TSA; (2) ComEd's purported termination of the Application did not terminate the TSA or relieve ComEd of its obligations thereunder; (3) a preliminary injunction returning the parties to the status quo, preserving it pending adjudication, and restraining ComEd from taking any actions inconsistent with this status quo, so as to cancel, terminate, or interfere with the Project; (4) damages arising from ComEd's breaches of the TSA; (5) damages under Section 5-201 of the Illinois Public Utilities Act arising from ComEd's violations of the Act and applicable ICC rules,

regulations, orders, or decisions; (6) damages arising from ComEd's tortious interference with business expectancy; and (7) such other and further complete relief as the Court deems just and proper.

## THE PARTIES

42. Customer is a Delaware limited liability company and is a data center developer. It is a joint venture of two experienced development partners, PowerHouse Data Centers, a division of American Real Estate Partners, which has nearly 10 gigawatts of capacity in operation or under development across eight states, and Hillwood, a real estate investment and development company whose flagship AllianceTexas development spans approximately 27,000 acres. Customer and its sponsors have decades of collective experience executing large-scale, infrastructure-intensive developments in partnership with public entities, utilities, and major corporate users.

43. ComEd is an Illinois corporation, with a principal place of business at 10 South Dearborn Street, Chicago, Illinois 60603. ComEd is the "Utility" in the TSA. ComEd is an energy delivery company providing retail electric utility services in northern Illinois, where it delivers energy to 4.2 million electric customers. This territory includes the Project site in Joliet, Illinois. On information and belief, ComEd has an 11,429 square-mile retail service territory, approximately 5,800 miles of transmission lines, approximately 2,200 substations, approximately 37,000 miles of aerial distribution facilities, and approximately 32,000 miles of underground distribution facilities. ComEd is the exclusive provider of interconnection services to large load customers in its service area.

44. ComEd is a subsidiary of Exelon Energy Delivery Company, LLC, wholly-owned by Exelon Corporation ("Exelon"). Exelon is a publicly traded Pennsylvania holding company listed on the NASDAQ exchange. Exelon is headquartered in Chicago. Exelon developed the

TSA at issue in this proceeding.

## JURISDICTION AND VENUE

45. On August 20, 2026, this Court denied Customer's emergency motion to remand and held that it has federal question jurisdiction under 28 U.S.C. § 1331 and 16 U.S.C. § 825p. ECF No. 54. This Court has authority to enter declaratory relief under 28 U.S.C. §§ 2201-2202 and injunctive relief under its general equity powers and Federal Rule of Civil Procedure 65. This Court has authority to award civil damages arising from ComEd's breaches of the TSA and other wrongful conduct in violation of the Illinois Public Utilities Act or any other rules, regulations, orders, or decisions of the ICC.

46. On September 22, 2026, FERC declined to exercise primary jurisdiction, reasoning that: (1) this Court "is at least as well positioned" as FERC to resolve this TSA interpretation dispute; (2) "there does not appear to be a need for uniformity of contract interpretation of the type of question raised by this dispute, as the dispute involves the interpretation of the terms of a bilateral agreement between only these parties and whether termination is permitted under the particular facts here"; and (3) to the extent that the parties' dispute is "important to the regulatory responsibilities of" FERC, that consideration does not "sufficiently outweigh" the other factors to warrant FERC's assertion of primary jurisdiction. Exhibit 14.

47. This Court has supplemental jurisdiction over any remaining claims pursuant to 28 U.S.C. § 1367(a).

48. This Court has personal jurisdiction over ComEd because ComEd is an Illinois corporation, resides and maintains its principal place of business in Illinois, entered into the TSA, which is substantially connected to Illinois, and transacts business in Illinois, including the business giving rise to this action.

49. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to this action occurred in this District, ComEd resides here, and the parties stipulated to venue in Chicago, Illinois under TSA § 24(C). This action was removed to this District from the Circuit Court of Cook County pursuant to 28 U.S.C. §§ 1441 and 1446.

## ALLEGATIONS OF FACT

### A. The Project and Customer's Long-Standing Development Efforts

50. The Project has been under development since 2024. Customer has paid millions in deposits and for non-refundable, pre-development work including legal and regulatory fees, environmental studies, and community engagement activities, and worked for years, directly or through affiliated entities, on the acquisition of land rights and related pre-approvals and approvals.

51. The Project's viability depends on a defined schedule for when it will reach commercial operation. The single indispensable input is access to delivered power: without ComEd's transmission and distribution service, the Project cannot operate.

52. Likewise, the Project depends on specialized equipment with long lead times, which include the gas-insulated substation ("GIS") industrial circuit breakers. Customer has paid ComEd $10,500,000 in deposits for these long lead materials and other associated engineering activities, which ComEd used to make a progress payment to [redacted] for GIS circuit breakers.

53. The Project will be a large load, ultimately ramping to approximately 1800MW, which will be supplied through new and modified transmission facilities that ComEd must build, and through the retail delivery service that ComEd, as the monopoly transmission and distribution utility, alone can provide.

54. Customer had satisfied, or was and is ready, willing, and able to satisfy when required to do so, all conditions required for the Project. This includes the land, the workers, the

necessary approvals, the equipment, the power supply, the end-users, and the personnel. Customer has suitable, willing, and capable tenants for the Project so long as in compliance with the TSA.

55. Customer has posted substantial security under ComEd's tariffs to fund long lead materials and engineering for the Project and is ready, willing, and able to post additional retail deposits, provided that the requests for these deposits include documentation for the deposits and that ComEd will not use the deposit for an improper alleged cancellation penalty under the TSA.

**B. The Transmission Security Agreement**

**Entry into the TSA**

56. To secure the transmission service the Project requires, ComEd required Customer to enter into the TSA, which ComEd presented to Customer as ComEd's standard form agreement.

57. ComEd uses TSAs with other customers, but Customer-specific changes are primarily reflected in the Exhibits, which contain negotiated amounts, dates, and other important terms that change from project to project.

58. Customer signed the TSA on December 29, 2025, and it was filed with FERC on January 13, 2026. It became effective on March 15, 2026 (the "Effective Date" under the TSA).

**This Project Ramp Starts in 2029 and Has a Schedule Running through 2035**

59. The TSA provides that Customer desires to electrically interconnect to ComEd's system for the purpose of taking retail electric delivery service. TSA Recitals at 1. The initial estimated service date is July 31, 2028, the "Commercial Operation Date." *Id.*

60. The ultimate anticipated transmission is 1800MW. Power ramps from only 19MW starting on the Commercial Operation Date but begins to increase substantially between 2029 and 2033. A full load of 1800MW is reached by June 2033, and continues through June 2035.

61. All of this is reflected in the preliminary requested load ramp in Exhibit B to the

TSA, the "Load and Phasing Schedule." TSA Recitals & Ex. B.

**The Letter of Credit Is Credit Support, and Must Conform to the Credit Support Schedule**

62. "Credit Support" is defined in the Exhibit A Definitions as "the Letter of Credit provided by Customer under the TSA." TSA, Ex. A.

63. Exhibit C to the TSA is the "Credit Support Schedule" that was negotiated between the parties for this particular Project.

64. Exhibit C to the TSA provides that:

> Upon issuance, the Credit Support shall have a face amount equal to the Credit Support Schedule set forth below for the applicable period. The Credit Support Schedule sets forth the amounts and dates the Customer is responsible for providing Credit Support during the Term of the TSA based on the Load and Phasing Schedule set forth in Exhibit B. It is calculated as the product of (a) the Power requirements in the table below and (b) the Zonal Network Service Rate of $46,025 MW-Year (PJM OATT, Attachment H-13A, line 175). The applicable Credit Support Requirement for each year is set forth in the table below.

| **Credit Support Schedule** | | |
|---|---|---|
| **Date** | **Power** | **Credit Support Requirement** |
| Year 1 – 2029 | 450 MW | $586,876,792 |
| Year 2 – 2030 | 900 MW | $528,189,113 |
| Year 3 – 2031 | 1350 MW | $469,501,434 |
| Year 4 – 2032 | 1688 MW | $410,813,754 |
| Year 5 – 2033 | 1800 MW | $352,126,075 |
| Year 6 – 2034 | 1800 MW | $293,438,396 |
| Year 7 – 2035 | 1800 MW | $234,750,717 |
| Year 8 – 2036 | 1800 MW | $176,063,038 |
| Year 9 – 2037 | 1800 MW | $117,375,358 |
| Year 10 – 2038 | 1800 MW | $58,687,679 |

65. Under the Exhibit A Definitions, "Credit Support" means "Letter of Credit." As a result, the first sentence of Exhibit C requires that the Letter of Credit "***shall have a face amount equal to the Credit Support Schedule set forth below for the applicable period***." TSA Exs. A, C.

66. This "Credit Support Schedule sets forth the amounts ***and dates*** the Customer is responsible for providing Credit Support during the Term of the TSA." TSA Ex. C.

67. The ***earliest date*** identified on the Credit Support Schedule is ***2029***. *Id.* This is the "Year 1" date on the Credit Support Schedule. Nowhere on Exhibit C does it reference 2026.

68. The second sentence of Exhibit C states that the "amounts and dates" are "based on the Load and Phasing Schedule set forth in Exhibit B." That too contains nothing for 2026 or 2027.

69. The third sentence of Exhibit C explains that the amount of Credit Support "is calculated as the product of" the "Power requirements in the table below" and "the rate of $46,025." Again here: there is no "Power requirement[]" for 2026, 2027, or 2028 on the chart. Therefore, $46,025 times zero = zero.

70. The final sentence of Exhibit C confirms that "The applicable Credit Support Requirement ***for each year*** is set forth" in the Credit Support Schedule. *Id.* Year 1 is 2029.

71. The TSA contains a merger clause that states that the TSA and its exhibits represent the entire understanding of the Parties. *Id.* § 12. It may be amended only in writing, signed by each of the Parties. *Id.* § 15. The TSA contains a *Mobile-Sierra* clause, which means that it cannot be amended unless it is contrary to the public interest, a high hurdle. *Id.* § 7(C)(b). And, as a FERC-accepted rate, the TSA must be applied as written.

72. Nothing in the TSA requires that Customer issue Credit Support in the amount of $586,876,792 before 2029.[10]

73. Finally, section 9(A)(a) of the TSA provides that:

> No later than thirty (30) days after the Effective Date, Customer

[10] The very formula of Exhibit C is designed to step down the obligation by $58,687,679 each year for ten years. It starts at 2029 and steps down in concert with the heavy ramp up and ten year schedule at the highest transmissions, through 2038.

> shall, at its own expense, issue or cause to be issued and maintained and maintain, by renewal, extension, or replacement, for the Term specified herein an irrevocable, unconditional, transferable, standby letter of credit (a "**Letter of Credit**") in favor of Utility meeting the requirements of this Section 9 and in substantially the same form and substance as attached hereto as Exhibit D (such letter of credit, as the same may be renewed, extended, or replaced from time to time hereunder, the "**Credit Support**") in favor of Utility to secure Customer's obligations under this TSA.

**The Earliest ComEd Could Draw on the Credit Support is 2029**

74. "Credit Support" "secure[s] Customer's obligations under the TSA." *Id.* § 9(A)(a).

75. These obligations include a "Committed Revenue Contribution," a payment to be made by Customer to ComEd post-commercial operation to guarantee that ComEd will receive a minimum level of revenues from the Customer for at least a ten year term of service. *Id.* § 9(B).

76. ComEd is required to calculate this "Committed Revenue Contribution" "as soon as reasonably practicable following each anniversary of the Commercial Operation Date," with the first anniversary in ***2029***. *Id.* § 9(B)(b), Recitals.

77. If these sums to be paid are less than the "Committed Revenue Contribution," a "Customer Shortfall Event" could occur, triggering more obligations. *Id.* § 9(B)(b). The earliest a Customer Shortfall Event could occur is, "Beginning on January 1 of the first calendar year following the Commercial Operation Date and continuing each calendar year thereafter until the expiration of the Term of the TSA," which would be ***January 2029***. *Id.* § 9(B)(b).

**Dispute Resolution and Governing Law Provisions**

78. Section 24(B) provides that:

> In the event of any dispute, controversy, or claim arising out of or relating to this TSA (a "**Dispute**"), within 10 Business Days following the delivered date of a written request by either Party, the Parties shall meet, negotiate, and attempt in good faith to resolve the Dispute quickly, informally, and inexpensively. In the event that the Parties have not resolved the Dispute within 30 days after the delivery date of the original written request by either Party or such

> longer period as the Parties may mutually agree is necessary to achieve resolution of the Dispute, within ten (10) Business Days following any request by either Party at any time thereafter, the senior officers for both Parties shall meet, negotiate and attempt in good faith to resolve the Dispute. Each Party will bear its own costs for this dispute resolution phase.

79. Under Section 24(C), "If meetings of the senior officers for both Parties have not resolved the Dispute within thirty (30) days of the submission of the matter to the senior officers or within such longer period as the Parties may agree to, either Party may exercise all remedies available at law or in equity under this TSA, including the initiation of court proceedings. The Parties hereby stipulate that venue is in Chicago, Illinois." *Id.* § 24(C).

80. Under Section 24(A), Illinois law applies. *Id.* § 24(A).

**C. Consistent with the Requirements of the TSA, Customer Provided the Credit Support; ComEd's Conduct Post-Dating the Notice of Default**

81. On April 14, 2026, Customer caused JPMorgan Chase Bank, N.A. to issue a Letter of Credit in the amount of $1.00 in the form required by the TSA.

82. On May 4, 2026, ComEd sent the Notice of Default. Customer was not in default. Customer identified the plain language of the TSA and initiated the dispute resolution process.

83. After the Notice of Default:

a. ComEd ceased performing under the TSA in violation of its obligations thereunder;

b. ComEd did not work, consistent with Good Utility Practice, retail service obligations, and applicable Retail Service Tariffs, to meet the requested Commercial Operation Date and Load and Phasing Schedule;

c. ComEd failed to use commercially reasonable efforts, consistent with its retail service obligations and applicable Retail Service Tariff, to meet the requested Commercial Operation Date and Load and Phasing Schedule; and

d. ComEd did not comply with its applicable retail service obligations, including the requirements of the Illinois Public Utilities Act governing rules and practices affecting service.

84. More specifically, following is a brief timeline of ComEd's actions taken after the

Notice of Default:

| Date | Description | Exhibit |
|---|---|---|
| **May 4, 2026** | ComEd sent the Notice of Default and announced that it was cancelling all project activities, including engineering, and cancelling the [redacted] long-lead order. | 3 |
| **May 15, 2026** | ComEd threatened that if it were successful in terminating the TSA, it would keep the increased deposits it was asking for as damages, thereby using its Retail Service Tariff as a means to breach the TSA. | 4 |
| **June 3, 2026** | The printed date of the [redacted] Purchase Order Revision (002), with a delivery date of November 25, 2030. This suggests that ComEd indeed cancelled the long lead order as threatened on May 4. Customer has never seen the original purchase order. | 6 |
| **July 1, 2026** | ComEd belatedly provided only a portion of the many requested materials, which revealed a revised Project schedule with a delay of ***more than two years*** to the Commercial Operation Date. Just six months after it signed the TSA, ComEd was forecasting that the first phase of the Project would not be tested, commissioned, and placed in service until May 20, 2030, and that full installation and commissioning is not forecast until February 3, 2021. | 8 |
| **July 24, 2026** | • ComEd stated it was unilaterally terminating the Application and cancelling the Project.<br>• ComEd filed the Notice of Cancellation of the TSA with FERC, which was ultimately rejected by FERC.<br>• ComEd engaged in improper communications with third parties falsely representing that the Project was already cancelled, including the Mayor and City Manager of Joliet; state representative Larry Walsh; the Data Center Coalition; and Labor Local 150.<br>• ComEd removed the Project from cluster 1. | 9, 13 ECF No. 79-1, ¶ 22 |
| **Aug. 28, 2026** | ComEd represented to this Court that the “earliest possible date” ComEd could provide service was now 2031. | 10 |

**ComEd Changes Its Form TSA to Clarify the Exact Point at Issue in this Dispute**

85. ComEd made a significant admission[11] concerning the language of the TSA after this dispute initially arose. After Customer explained why the plain language of the TSA did not reflect ComEd's position, in the Spring of 2026, ComEd changed several of the subsequent TSAs filed with FERC to add language to Section 9(A)(a) to require that the face amount of the Letter of Credit at the time of issuance (through and until the 2nd anniversary of the Commercial Operation Date) equal 100% of the Year 1 Credit Support Requirement set forth in the TSA's Exhibit C. This new language for Section 9(A)(a) is in red/bold below:

| TSA In This Case | Future TSAs |
|---|---|
| No later than thirty (30) days after the Effective Date, Customer shall, at its own expense, issue or cause to be issued and maintained and maintain, by renewal, extension, or replacement, for the Term specified herein an irrevocable, unconditional, transferable, standby letter of credit (a "**Letter of Credit**") in favor of Utility meeting the requirements of this Section 9 and in substantially the same form and substance as attached hereto as Exhibit D (such letter of credit, as the same may be renewed, extended, or replaced from time to time hereunder, the "**Credit Support**") in favor of Utility to secure Customer's obligations under this TSA. | No later than [REDACTED] after the Effective Date, Customer shall, at its own expense, issue or cause to be issued and maintained and maintain, by renewal, extension, or replacement, for the Term specified herein an irrevocable, unconditional, transferable, standby letter of credit (a "**Letter of Credit**") in favor of Utility meeting the requirements of this Section 9 and in substantially the same form and substance as attached hereto as Exhibit D (such letter of credit, as the same may be renewed, extended, or replaced from time to time hereunder, the "**Credit Support**") in favor of Utility to secure Customer's obligations under this TSA. **For the avoidance of doubt, the face amount of the Letter of Credit at the time of issuance (through and until the 2nd anniversary of the Commercial Operation Date) shall equal 100% of the Year 1 Credit Support Requirement set forth in Exhibit C**. |

86. On information and belief, ComEd used this new language in TSAs with Karis

[11] See Exhibit 10, Aug. 28, 2026 Hr'g Tr. at 5:6-8 ("And I also think it's clear that ComEd realized that that contract needed a bit of revising because going forward, that's what you did with other folks and made it clear.").

Critical, LLC, Pioneer Development LLC, and Tur Ventures Two LLC. Attached as Exhibits 15, 16 and 17 are true and correct publicly available copies of these TSAs.

87. In transmittal letters to FERC, ComEd represented that it made "material" changes to the TSAs, which likely refers to this added language. Attached as Exhibit 18 is an illustrative example of a transmittal letter for Karis Critical, LLC, with the relevant language highlighted for convenience on page 2, footnote 6.

88. Customer has not sought to amend the TSA to make a similar material change to its Credit Support provision.

89. That said, as Customer has represented to ComEd and FERC (which would have to approve a revised TSA reflecting such change), Customer has indicated a willingness to work with ComEd to amend the TSA to provide a more sizable amount of credit support before the currently effective TSA otherwise would require such posting in Year 1. ComEd has not been receptive to any of these proposals to date. Absent a mutually-agreed amendment, Customer intends to provide the security that TSA Exhibit C requires on the schedule in Exhibit C. ComEd is attempting to force security upon Customer that is far different.

## **CAUSES OF ACTION**

### **COUNT I**
### **Declaratory Judgment – TSA**

90. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

91. A substantial and actual controversy between the Parties exists regarding the face amount of the Credit Support required in the TSA.

92. The credit amount of $586,876,792 is not required until 2029.

93. The position ComEd has maintained, that $586,876,792 in Credit Support is

required years before the Commercial Operation Date, is inconsistent with the express language of the TSA.

94. An actual controversy exists within the meaning of 28 U.S.C. § 2201 and Article III of the United States Constitution.

95. The controversy is sufficiently immediate and real to warrant the issuance of a declaratory judgment because ComEd has sent a Notice of Default, and the parties have to date been unable to resolve this dispute following the procedure set forth in the TSA. This dispute is neither abstract nor premature and admits of an immediate and definitive determination.

96. Customer seeks a declaration that the $586,876,792 amount of Credit Support is due in 2029, and, therefore, Customer's issuance of Credit Support for 2026 complied with the TSA and the Notice of Default is invalid.

**COUNT II**
**Declaratory Judgment – Application**

97. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

98. For purposes of this Count, Customer does not ask this Court to determine whether ComEd's purported cancellation of the Application complied with Illinois law, ComEd's Retail Service Tariff, the Illinois Public Utilities Act or any other rules, regulations, orders, or decisions of the ICC.

99. Even assuming without conceding that the cancellation of the Application was effective, termination of the Application did not terminate the TSA or excuse ComEd from performing its obligations under the TSA.

100. A substantial and actual controversy therefore exists concerning ComEd's continuing obligations under the TSA notwithstanding its purported termination of the

Application.

101. An actual controversy exists within the meaning of 28 U.S.C. § 2201 and Article III of the United States Constitution.

102. Customer therefore seeks a declaration that ComEd's purported termination of the Application did not terminate the TSA or relieve ComEd of its obligations thereunder.

**COUNT III**
**Injunctive Relief**

103. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

104. Injunctive relief pending adjudication is necessary to preserve the status quo while the Court determines the parties' dispute over Credit Support and to restrain ComEd from taking further actions to disrupt this status quo.

105. The status quo to be preserved is the last, peaceable, uncontested state.

106. Absent an injunction, Customer faces the immediate risk that ComEd will continue to do everything in its power to destroy the status quo before this Court can resolve the parties' dispute over interpretation of the Credit Support provision in the TSA.

107. ComEd will continue to take actions that bypass the legal process with the express purpose of causing irreparable harm to effectively end the Project.

108. There is no substitute utility to transmit power from the grid for the Project; ComEd is the monopoly provider. The Project's viability and place in the interconnection and service queue depend on the already-established timeline and load ramp schedule that is unique to this Project. Absent an injunction, Customer will lose its place in ComEd's queue and cluster study process, resulting in an estimated three- to five-year delay, with all the labor and customers lined up for this Project, gone.

109. Resolution of this dispute is necessary for Customer to proceed with the Project.

110. ComEd's tactics leave Customer with no adequate remedy at law. Money damages after the Project is already done cannot restore what will have been lost in the interim, and no legal process can resurrect a project once its customers, suppliers, and labor have moved on.

111. The stakes could not be higher for Customer. The viability of the Project hangs in the balance. Absent injunctive relief, no Project will be left.

112. Customer has clearly ascertainable rights in need of protection regarding the Credit Support requirements under the TSA.

113. Customer is likely to succeed on the merits, given that ComEd's demand to post substantial Credit Support years before the Commercial Operation Date is inconsistent with the express terms of the TSA. ComEd's demand for additional deposits because of the TSA dispute likewise violates the TSA because it is a transparent attempt to seek additional security deposits in a manner not provided for under the TSA Credit Support requirements.

114. ComEd's incorrect reading of the TSA and ending of the Project would also damage Customer's reputation for reliability in the market and interfere with Customer's business relations. This Project has been publicly maligned in national press due to ComEd's actions.

115. Legal remedies are therefore inadequate, and only injunctive relief preserving the status quo can prevent irreparable harm.

116. The balance of hardships weighs decisively in Customer's favor. ComEd suffers no hardship from an injunction. But if ComEd is not restrained, ComEd could continue to undermine this multi-billion dollar Project, which will result in the loss of an estimated 10,000 construction jobs, 700 permanent positions, the $100 million commitment by the sponsor to the City of Joliet for community improvement investments, and over a billion dollars in tax revenue

to Joliet over the next 30 years.

117. Allowing the Project to proceed is in the public interest, given the significant benefits and growth it will bring to the Joliet community. It enjoys widespread support of labor and trade union members. Justice favors a deliberative process and litigation on the merits. It does not favor one party using monopoly power to effectively destroy a Project before legal process can commence. The public interest is served by holding a monopoly utility to the terms of its FERC-accepted agreement.

118. Customer is entitled to injunctive relief a preliminary injunction returning the parties to the status quo, preserving it pending adjudication, and restraining ComEd from taking any actions inconsistent with this status quo, so as to cancel, terminate, or interfere with the Project.

**COUNT IV**
**Breach of Contract**

119. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

120. The TSA is a valid and enforceable contract between Customer and ComEd, accepted by FERC and governed by Illinois law.

121. Customer has performed all of its obligations under the TSA, including issuance of Credit Support required for 2026.

122. ComEd breached the TSA by demanding provision of Credit Support not required by the TSA and ceasing performance under and failing to comply with the TSA thereafter.

123. ComEd further breached the TSA by ceasing performance and taking actions inconsistent with its continuing obligations under the TSA based on Customer's alleged noncompliance with separate retail-service requirements.

124. To the extent there is no longer a path forward because of ComEd's efforts to end

the Project, Customer seeks damages.

125. ComEd's conduct to end the Project has resulted in billions of dollars of damages for which Customer should be entitled to recovery. These damages include: (1) the harm that has already occurred, that cannot be remedied sufficiently by injunctive or equitable relief; and (2) to the extent it becomes impossible to preserve the Project as agreed and contemplated in the TSA because of ComEd's breaches and interference with the Project, to redress the substantial losses caused by ComEd's wrongful conduct..

126. These damages were foreseeable and contemplated by the parties and they flow directly from ComEd's misconduct and breaches of the TSA.

127. Under TSA Section 24(C), having completed the dispute-resolution process, Customer is entitled to exercise all remedies available at law or in equity under the TSA, including the recovery of damages.

**COUNT V**
**Damages Under Section 5-201 of the Illinois Public Utilities Act**

128. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

129. ComEd is a public utility subject to the Illinois Public Utilities Act, 220 ILCS 5/1-101, et seq. (the "Act"), and to the rates, terms, conditions, and rules in its applicable schedules filed with and approved by the ICC. Those ICC-approved tariffs are binding on ComEd and its customers and have the force and effect of law..

130. ComEd's applicable tariffs include ILL. C. C. No. 10 General Terms and Conditions, including Sheet No. 149.3, which governs certain obligations associated with large-demand service applications, including deposits for long-lead materials and certain permits, easements, and other land rights.

131. Sheet No. 149.3 provides that a Large Demand Project Applicant or Customer "shall provide a deposit sufficient to secure the costs of procurement of long lead materials required for the Applicant's or Customer's project, as determined by the Company." With respect to land rights, Sheet No. 149.3 provides that the applicant "must provide the Company with such permits, easements, or other rights as the Company reasonably deems necessary for the ownership, installation, operation, replacement, and maintenance of the Company's distribution facilities located or to be located at the premises for the provision of electric service."

132. ComEd demanded additional retail security from Customer and, on July 24, 2026, advised Customer that it was "terminating the RSA and cancelling the Project," effective immediately, based on Customer's alleged failure to provide the requested additional long-lead-material deposit and certain permits, easements, or other land rights. ComEd further stated that it would "cease further work on the Project, including cancelling all future project status meetings and long lead material orders."

133. ComEd ceased processing Customer's request for service and purported to remove the Project from its existing position in ComEd's service-planning process.

134. Section 5-201 of the Act provides a civil remedy for loss, damage, or injury caused by a public utility's violation of the Act or an applicable ICC rule, regulation, order, or decision. 220 ILCS 5/5-201.

135. ComEd created and applied a rule or practice under which an alleged failure to satisfy ComEd's requirements under Sheet 149.3 resulted in what ComEd characterized as immediate termination of Customer's Retail Service Application and cessation of further work on Customer's request for service.

136. Neither Sheet 149.3, the Application, nor any other applicable tariff, ICC rule, regulation, order, or decision provides for that consequence. ComEd did not file any schedule or supplement establishing that rule or practice or otherwise comply with the requirements of Section 9-201(a) of the Act.

137. By creating and applying this unauthorized and unfiled rule or practice, ComEd violated Section 9-201(a) of the Act.

138. As a direct result of ComEd's violation, Customer suffered loss, damage, and injury to its interests in the Project, including expenditures and other project-related losses resulting from ComEd's cessation of work on Customer's request for service and the loss of the Project's existing service-process position. Customer seeks recovery of those damages under §5-201 of the Act, without duplicative recovery for damages resulting from ComEd's breaches of the TSA.

139. Customer seeks damages under § 5-201, together with the attorney's fees provided by that section and such other relief as the Court may lawfully award.

**COUNT VI**
**Tortious Interference with Business Expectancy**

140. Customer realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

141. Customer had a valid business relationship or a reasonable expectation of entering into valid business relationships related to the Project and the Project site, including with tenants, end users, Joliet, and others.

142. ComEd had knowledge of these relationships or expectancy.

143. ComEd intentionally interfered, inducing or causing a breach or termination of these relationships or expectancy. ComEd did this by engaging in improper communications with third parties falsely representing that the Project was already cancelled, including the Mayor and

City Manager of Joliet; state representative Larry Walsh; the Data Center Coalition; and Labor Local 150.

144. Customer suffered damages as a result of ComEd's intentional interference.

**PRAYER FOR RELIEF**

WHEREFORE, Customer respectfully requests that this Court enter judgment in its favor and against ComEd, and grant the following relief:

1. A declaration that the $586,876,792 amount of Credit Support is due in 2029, and, therefore, Customer's issuance of Credit Support for 2026 complied with the TSA and the Notice of Default is invalid;

2. A declaration that ComEd's purported termination of the Application did not terminate the TSA or relieve ComEd of its obligations thereunder;

3. A preliminary injunction a preliminary injunction returning the parties to the status quo, preserving it pending adjudication, and restraining ComEd from taking any actions inconsistent with this status quo, so as to cancel, terminate, or interfere with the Project;

4. An award of damages arising from ComEd's breaches of the TSA in an amount to be proven at trial;

5. An award of damages under Section 5-201 of the Illinois Public Utilities Act for ComEd's violations of the Act and applicable ICC rules, regulations, orders, or decisions in an amount to be proven at trial;

6. An award of damages arising from ComEd's tortious interference with business expectancy in an amount to be proven at trial;

7. An award of Customer's costs and expenses, including reasonable attorneys' fees, to the extent permitted by law; and

8. Such other and further complete relief as the Court deems just and proper.

Dated: October 1, 2026

Respectfully submitted,

POWERHOUSE HILLWOOD HOLDING LLC

By: */s/ Randall H. Miller*
One of Its Attorneys

ARNOLD & PORTER KAYE SCHOLER LLP

Randall H. Miller
David S. Jelsma*
1144 Fifteenth Street, Suite 3100
Denver, Colorado 80202
Tel: (303) 863-1000
Email: randy.miller@arnoldporter.com
Email: david.jelsma@arnoldporter.com

Sandy Rizzo*
601 Massachusetts Ave., NW Washington, DC
20001-3743 Tel: (202) 942.5826
Email: sandra.rizzo@arnoldporter.com

John F. Hagan, Jr.
Stephanna F. Szotkowski, *pro hac vice*
Nicholas Zebrowski*
Owen Haney*
Nikolas Bindi*
300 North LaSalle Drive, Suite 3500
Chicago, Illinois 60654
Tel: (312) 583-2300
Email: john.hagan@arnoldporter.com
Email:
stephanna.szotkowski@arnoldporter.com
Email: owen.haney@arnoldporter.com
Email: nikolas.bindi@arnoldporter.com
**Pro hac vice forthcoming*