**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| POWERHOUSE HILLWOOD HOLDING LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>COMMONWEALTH EDISON COMPANY,<br><br>*Defendant*. | Case No. 1:26-cv-8860 |

**PLAINTIFF'S REPLY IN FURTHER SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

Three points are now undisputed: *First*, the TSA[1] remains in effect after FERC rejected ComEd's Notice of Cancellation. *Second*, neither party claims the Credit Support provision is ambiguous, so its meaning presents a pure question of law. ComEd concedes that the $586,876,792 figure "sits in a row labeled 'Year 1 – 2029,'" and argues only for a contrary reading based on "context," although that is incorrect as well. Opp. 11. *Third*, ComEd does not deny that its post-dispute changes to its form TSA would have been unnecessary if the TSA here already said what ComEd now claims.

ComEd's arguments about what security ought to be required cannot rewrite the dates in its own form agreement, so its opposition is mostly about something else. It recasts this motion as a demand for new retail service that only the ICC can address. It labels the requested injunction as "mandatory" (Opp. 1, 4) and says it would give Customer "substantially all the relief it seeks" and, at the same time, "nothing" (*id.* at 2, 11). None of these characterizations holds.

[1] Capitalized terms have the same meaning as in Customer's opening brief (ECF No. 105-1) ("Br."). Exhibits to the AC are identified by "AC, Ex. _."

Count I seeks a declaration that Customer satisfied the TSA's Credit Support requirements and that ComEd's asserted default is invalid. AC ¶ 96. ComEd invoked that default to stop performing under the TSA and to begin dismantling the Project's arrangements. An order preventing ComEd from acting on the default while the Court decides whether it occurred protects the very rights that judgment would establish. Part A.2, *infra*. That relief requires no ICC rate to be set, no ICC rule to be construed, and no tariff to be interpreted. Any necessary regulatory determination can remain with the ICC, which cannot itself grant interim relief, while tailored relief preserves the practical value of both judicial and administrative review. Part A.3, *infra*.

ComEd's remaining arguments fare no better. Customer did not inflict its own harm by declining to voluntarily deliver over half a billion dollars three years before the TSA requires it, in the face of ComEd' timing threats, simply to settle the question this suit presents. ComEd chose to dismantle the Project's position with full knowledge of this suit. The risks it now cites are speculative, of its own making, or readily secured by a bond in the amount the Court deems appropriate, increased as the Project proceeds. Parts B–C, *infra*. On the other side of the balance are the jobs, investment, and tax revenues the Project would bring to Joliet. Br. 1–2; Part C, *infra*.

This Court should return the parties to the last uncontested status preceding this litigation and preserve that status quo pending adjudication, so that a decision vindicating Customer's rights is more than an empty victory. ComEd should not be permitted to make its disputed default notice the final word by dismantling the Project before the Court decides whether that notice was valid.

## ARGUMENT

ComEd does not contest that this Court can return the parties to the status quo and preserve it (Br. 12-13), or that the status quo is the last uncontested status preceding this lawsuit. *Id.*; AC, Ex. 5, Aug. 5, 2026 Hr'g Tr. at 26:17-23, 27:3-7. Instead, ComEd seeks to profit from a situation of its own making, because of what it chose to do to disrupt the status quo, all with full knowledge

of the law, Customer's suit, and the relief sought. Br. 11-12; AC ¶¶ 82-84. ComEd took the risk that its choices would be undone. This does not change the law or the status quo, or make the relief "mandatory."[2] A preservation injunction returning the parties to the status quo is the right result.

**A. Customer Is Likely to Succeed on the Merits**

**1. The TSA Does Not Require the Year 1 (2029) Amount in 2026**

ComEd spends very little of its opposition refuting Customer's interpretation of the unambiguous security provision of the TSA. Br. 8-11, 13-14; Opp. 9-11. ComEd's only textual argument is that Customer's reading does not give effect to the thirty-day requirement after the Effective Date in § 9(A)(a) to post security, or the phrase "[u]pon issuance" in Exhibit C. But Customer timely complied with those provisions by posting the Credit Support required within thirty days of the Effective Date on April 14, 2026. AC ¶¶ 18, 81.

The question is what face amount the TSA required at that time, and Exhibit C answers it: Exhibit C says, "[u]pon issuance, the Credit Support shall have a face amount equal to the Credit Support Schedule set forth below for the applicable period." *Id.* ¶¶ 64-70; TSA. Ex. C. ComEd acknowledges (Opp. 11), as it must, that the first entry in the Credit Support Schedule is for "Year 1- 2029." There is no mention of 2026, 2027, or 2028. Had ComEd wanted to require the 2029 security "[u]pon issuance" of the first letter of credit in 2026, that is what the TSA should have said. ComEd knows very well how to say that. After this dispute arose, ComEd revised § 9(A)(a)

---

[2] ComEd has not shown otherwise in the authority it cites. Opp. 2, 4, 14-15; *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997) (affirming denial of injunction requiring provision of an experimental medication, where evidence did not show it was more effective than chemotherapy available or irreparable harm, with no discussion of preserving the status quo); *Jordan v. Wolke*, 593 F.2d 772, 773 (7th Cir. 1978) (reversing an injunction requiring construction of facilities for jail contact visitation and remanding for more realistic consideration of the alleged constitutional problem and a possible solution); *Santa Maria v. Loyola Univ. Of Chicago Stritch Sch. of Med.*, 24-cv-1698, 2025 WL 96482, at *7-9 (N.D. Ill. Jan. 14, 2025) (Ellis, J.) (injunction would alter the status quo rather than preserve it, where status quo was not being in a program because of poor academic performance and injunction would require readmission).

of its form TSA to provide that the face amount "at the time of issuance . . . shall equal 100% of the Year 1 Credit Support Requirement." AC ¶¶ 85–89 & Exs. 15–17; Br. 10–11. And ComEd knows that is not what it said in its TSA with Customer: that is why it told FERC its change in the form agreement was "material." AC ¶ 87; *id.*, Ex. 18.

ComEd's alternative reading is that "upon issuance" fixes the amount and Exhibit C marks only "when the amount declines." Opp. 11. That reading rewrites the Schedule. Exhibit C says the dates identify when Customer is "responsible for providing" each amount, not when amounts step down. This gives no effect to "for the applicable period," "amounts and dates," or "for each year."

ComEd's remaining arguments concern purpose, not text. ComEd omits key parts of § 9(A)(f) of the TSA (Opp. 10) to argue that Customer's interpretation is inconsistent with what the Credit Support is meant to secure. Omitted language is in italics: "Utility may draw upon the Credit Support or cash security for any and all unpaid costs or amounts owed to it pursuant to this TSA *in accordance with the terms of the Credit Support and this TSA*." The Early Termination Fee argument also fails. Exhibit E measures that fee from the Effective Date, while Exhibit C schedules Credit Support from 2029. The TSA therefore treats the two differently. That difference reflects what the Credit Support secures: Customer's commitment to pay transmission revenue after energization. *See* Opp. 3 (TSA requires a customer "to back its transmission-revenue commitments with a letter of credit"). ComEd first calculates that commitment, the Committed Revenue Contribution, on January 1, 2029. TSA § 9(B)(b); AC ¶¶ 75–77.

Section 9(A)(f) allows draws only "in accordance with the terms of the Credit Support and this TSA," which must tie to the face amount Exhibit C requires at the time. ComEd may wish the two were tied together, but they are not. Where, as here, a contract is unambiguous, "the parties' intent must be ascertained exclusively from the express language of the contract," *Meyer v.*

*Marilyn Miglin, Inc.*, 273 Ill. App. 3d 882, 888 (1995), not its later claims of its purpose.

The statements of individual Commissioners (Opp. 10) express their views about what security agreements *should* require. They do not construe this TSA. FERC returned that question to this Court. AC Ex. 14 at 11–12. ComEd ignores that two of the Commissioners characterized the parties' dispute over the TSA as involving a potential "contracting error." *Commonwealth Edison Co.*, 196 FERC ¶ 61,226 (2026) (Swett, Chair and See, Comm'r, concurring at P 2). ComEd's argument is not about interpretation but what ComEd wishes it had drafted.

If ComEd believes the TSA's security terms are inadequate, its recourse is a prospective change to the TSA, subject to the parties' *Mobile-Sierra* agreement, TSA § 7(C)(b). It is not a construction that reads the change in retroactively. As Customer has represented to ComEd and FERC (which would have to approve any revised TSA), Customer has indicated a willingness to work with ComEd to amend the TSA to provide a more sizable amount of credit support before the currently effective TSA otherwise would require such posting in Year 1. ComEd has not been receptive to an amendment on reasonable terms and refuses to recognize the importance of the timing requirements. ComEd has instead persisted in attempting to force Customer to provide the level of security established for 2029 in 2026. AC ¶ 89. Worse, it does so without conceding the impact of ComEd's delays on timing. In short, Customer seeks only an interpretation of when security is required under the TSA based on what the contract actually says.

**2. Preservation Relief Protects the Contractual Rights at Issue**

ComEd's claim that there is a "fatal mismatch" between the declaratory relief Customer seeks in Count I and the requested injunction, Opp. 4-5, rests on an incomplete account of both Customer's claim and the relief it supports. Count I seeks a declaration not merely about a payment date, but also that Customer's issuance of Credit Support complied with the TSA and ComEd's Notice of Default is invalid. AC ¶ 96. ComEd claimed a default to stop performance and begin

dismantling the arrangements for the Project. *Id.* ¶¶ 82–84. Customer seeks an injunction preventing ComEd from withholding performance due to an invalid default of a still-effective TSA. This simply protects the rights a judgment on Count I would establish.

ComEd's obligations in the TSA are clear. Section 3(D) requires ComEd to work toward the requested Commercial Operation Date of July 31, 2028 and the Load and Phasing Schedule; § 4(A) addresses Project Development; and § 8 requires commercially reasonable efforts to meet requested dates. Customer seeks enforcement of those provisions, to preserve the status quo pending adjudication. As ComEd confirmed early on in the Project, this is not a big lift as "[t]he identified work is not extensive" for this or other projects in Cluster 1. Fleit Decl., Ex. 1.

ComEd's observation that the complaint does not demand a permanent injunction, Opp. 5, does not establish a remedial mismatch. Congress authorizes "[f]urther necessary or proper relief based on a declaratory judgment," 28 U.S.C. § 2202; and the complaint requests "Such other and further complete relief as the Court deems just and proper." AC at 31. In *Martin v. Helstad*, 699 F.2d 387, 389 n.2 (7th Cir. 1983), the Seventh Circuit relied on § 2202 and a general prayer for further relief to recognize the availability of injunctive relief beyond the complaint's specific request. A judgment declaring the asserted default invalid may therefore be implemented through appropriate injunctive relief, provided the requirements for that relief are satisfied. The cases ComEd cites stand merely for the proposition that an injunction cannot be based on topics or claims not pleaded.[3] No such inconsistency between the pleading and the relief requested exists here.

---

[3] *De Beers Consol. Mines v. United States*, 325 U.S. 212, 220 (1945) (injunction "deals with a matter lying wholly outside the issues in the suit" and seeks seizure unavailable under claims); *Authenticom, Inc. v. CDK Global, LLC*, 874 F.3d 1019, 1024, 1026 (7th Cir. 2017) (reversing injunction because it required "defendants to enter into an entirely new arrangement" "on terms to which they did not agree" rather than relief that would be available for alleged antitrust violation); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32-33 (2008) (legal claim that Navy must prepare an environmental impact statement (not cease sonar training) was not basis to enjoin training); *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1128 (11th Cir. 2005) (recognizing that injunction must "give[ ] some or all of the substantive relief sought

### 3. The ICC's Authority Does Not Foreclose the Requested Relief

ComEd's jurisdictional argument combines two questions. The first is whether the ICC has authority over the claim this Court must decide. The second is whether the ICC's authority over related retail matters bars this Court from preserving the status quo while that claim is resolved. The answer to both is no.

#### i. The ICC's Authority over Retail Matters Does Not Implicate ComEd's TSA Obligations

ComEd conflates authority to decide disputed retail-service requirements with authority to enforce the TSA. The Court has already held that this dispute over a FERC-accepted rate schedule falls within federal jurisdiction. ECF No. 54. FERC subsequently declined to exercise primary jurisdiction over the contract dispute, explaining that this Court was at least as well positioned to resolve it. AC ¶ 46. ComEd's invocation of ICC's authority over retail matters does not address what the effective TSA requires or whether its asserted TSA default is valid.

The ICC's exclusive jurisdiction applies only when "an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve," such that "the issue must be referred to the agency." *Arsberry v. Illinois*, 244 F.3d 558, 563 (7th Cir. 2001). Jurisdiction turns on "the nature of the relief sought." *Sheffler v. Commonwealth Edison Co.*, 2011 IL 110166, ¶ 50. Other than invoking the ICC's general authority over retail service (Opp. 9), ComEd identifies no tariff provision whose meaning is disputed here, no ICC rule that must be construed to resolve this

---

in the complaint"); *Omega World Travel, Inc. v. Trans World Airlines*, 111 F.3d 14, 16 (4th Cir. 1997) ("[plaintiff] literally seeks through its antitrust claim to dissolve the very contractual relationship which it seeks to have preserved through preliminary injunction," making the injunction "directly contradictory to" the relief sought); *Jones v. Willis*, 23-cv-2804, 2024 WL 4165379, at *2-3 (S.D. Ill. Aug. 21, 2024) ("allegations about topics" from preliminary injunction motion "do not warrant any present relief" because these topics are unrelated to *pro se* plaintiff's claims the court previously designated in an order); *In re Teknek, LLC*, 343 B.R. 850, 868-69 (Bankr. N.D. Ill. 2006) (injunction to freeze U.S. assets could not be premised on veil-piercing claim). This is not a situation as in *Betts v. Bd. of Educ. of City of Chicago*, 466 F.2d 629, 632-33 (7th Cir. 1972), where the relief sought is not mentioned in the counts. AC ¶¶ 103-18.

dispute, and no rate that must be set before this Court can grant the requested relief. This relief rests solely on interpretation of the effective TSA, which remains in force. Even if ComEd's cancellation of the Application were effective (which the Court need not address), it does not change this, as nothing in the TSA says that cancelling the Application impacts the TSA. *Commonwealth Edison Co.*, 196 FERC ¶ 61,211, at P 6 (2026) (*Red Energy*); AC ¶ 33 n.9, 34 (reaching same conclusion for materially-identical TSA). ComEd does not contend otherwise.

ComEd's authorities establish only that the ICC decides what a utility may charge and how the ICC's rules apply; none holds that the ICC's retail authority reaches a utility's refusal to perform a FERC-accepted contract. In *Sheffler*, the court reasoned that a claim belongs to the ICC "when the essence of the claim is that a utility has charged too much for a service," but it belongs to the courts "when the essence of the complaint is that the utility has done something else to wrong the plaintiff." *Sheffler*, 2011 IL 110166, ¶ 42. There, plaintiffs sought compensation for outage-related losses based on "ComEd's allegedly inadequate service," (*id.* ¶ 53), which is not at issue here.[4] None of ComEd's decisions that it cites address how courts should address obligations imposed by a separate, effective, FERC-accepted TSA.

Without identifying any supporting authority, ComEd makes the unsubstantiated claim that "Illinois foreclosed injunctive relief" in cases like this (Opp. 8). ComEd misreads 220 ILCS 5/4-202, under which the ICC adopts a resolution, sues, and "in the meantime said public utility may

[4] ComEd's remaining authorities involve situations not relevant here that required the ICC to apply its own rules or to measure a charge. In *Friederich*, the dispute "involve[d] the interpretation and application of rules of the [ICC] regarding the extension of water service." *Friederich v. Ill.-Am. Water Co.*, 94 Ill. App. 3d 172, 176 (5th Dist. 1981). In *Greenside*, which ComEd calls a "refusal to connect service" case, Opp. 6, at issue was a rate billing dispute: the plaintiff alleged it was billed for gas after requesting termination, and the utility's refusal to connect other properties followed from those disputed bills. *Greenside Props., LLC v. Peoples Gas Light & Coke Co.*, 2017 IL App (1st) 162821, ¶¶ 1, 7. The court held that "the compensation for billing errors sought here qualifies as reparations." *Id.* ¶ 19. And *Held v. Stanback* involved an order requiring a utility to correct billing and reconnect service. 2025 IL App (1st) 250307, ¶ 38-39.

be restrained." Opp. 7. But the "restraint" comes from the court, not the ICC. Even if Customer could obtain emergency consideration from the ICC on the compressed timetable ComEd imagines, the ICC lacks authority to issue the injunction Customer seeks. Br. 4-5 & n.3. ComEd cites *Pusateri*, a False Claims Act suit that alleged a utility "used fraudulent means to get the State (and others) to pay too much for natural gas," and in which the plaintiff's reading of the statute would have "invite[d] the circuit court to review [an ICC] rate order collaterally." *State ex rel. Pusateri v. Peoples Gas Light & Coke Co.*, 2014 IL 116844, ¶¶ 19, 27. But *Pusateri* involved no request for injunctive relief, and unlike that case, enforcing the TSA does not require this Court to revise an ICC rate order or assume the ICC's regulatory responsibilities. The injunction simply requires ComEd to honor the contractual obligations properly before this Court. It in no way would prevent the ICC from addressing any issue that arises within its jurisdiction.

**ii. ICC Jurisdiction Over Retail Questions Does Not Bar Preservation Relief**

Even if resolution of a particular retail issue was eventually necessary, this Court can nevertheless resolve this matter while allowing that issue to be presented in due course to the ICC. Primary jurisdiction does not divest a court of jurisdiction over the action before it. *Reiter v. Cooper*, 507 U.S. 258, 268–69 (1993). Customer does not ask the Court to displace the ICC's jurisdiction. It merely asks the Court to address the TSA claims properly before it without prejudice to administrative determination of any of any retail issues within the ICC's jurisdiction. And interim relief can protect, rather than invade, an agency's authority. In *Bhd. of Locomotive Eng'rs v. Missouri-Kansas-Texas R. Co.*, the Supreme Court upheld conditions preserving the status quo pending an agency's exclusive determination of the underlying dispute because they "would operate to preserve that jurisdiction," preserving the status quo to ensure that a favorable agency decision was not merely "an empty victory." 363 U.S. 528, 534 (1960). The same concern supports

interim protection of the TSA rights before this Court without prejudice to any necessary retail determination before the ICC.

ComEd's efforts to distinguish cases granting equitable relief fail. Opp. 8 & n.4. *First*, although the cases Customer cites arose under particular regulatory statutes, their reasoning expressly drew on traditional equitable authority. *Locomotive Engineers* required "the clearest legislative direction" to truncate the court's power to condition equitable relief. 363 U.S. at 532. *Second*, ComEd's suggestion that these cases are incompatible with the modern likelihood-of-success requirement overlooks what they actually held. *Trans Int'l Airlines, Inc. v. Int'l Bhd. of Teamsters* expressly required satisfaction of the traditional preliminary-injunction standards, including a showing concerning the movant's likely success on its contractual interpretation. 650 F.2d at 966-67 & n.13 (9th Cir. 1980). *Murray Ohio Mfg. Co. v. Louisville & N. R. Co.* likewise found a substantial likelihood of success before granting interim relief. 496 F. Supp. 179, 182 (M.D. Tenn. 1980). Customer's strong showing that it is likely to succeed under the TSA falls well within that requirement. *Third*, ComEd has not shown that resolution of any disputed retail-service issue is a prerequisite to this Court's resolution of the TSA claim or to interim relief preserving the status quo while any such issue is presented to the ICC. *Finally*, ComEd's effort to portray the requested relief as compelling "new service" overlooks that the existing TSA already imposes the obligations the requested relief would preserve. Opp. 8. The relevant status quo is performance of an effective TSA for a Project under development.

Nor does ComEd's reliance on *ICC v. Ameren Illinois Co.*, No. 20-0389, establish that administrative proceedings would provide effective interim protection, Opp. 7–8, much less that the ICC "has ample authority to act" within days. The emergency motion in *Ameren* arose in a proceeding already pending for more than five months, in which the ICC had recently entered an

Interim Order. Moreover, ICC Staff explained that the ICC "lacks the authority to consider equitable issues, including the issuance of injunctive relief." *Id.*, ICC Staff Resp. at 3 (Ill. Comm. Comm'n Sept. 30, 2020). The ICC held that it "cannot grant" the requested temporary stay, rejected an expedited tariff amendment as not "feasible," and could only "urge[]" (but not require) the utility to hold off. *Id.,* Second Interim Order at 7-9 (Ill. Comm. Comm'n Oct. 1, 2020).

Finally, ComEd's self-serving prediction that Customer will lose before the ICC does not dispose of Customer's showing that the asserted Credit Support default is invalid and enforceable TSA obligations remain. Opp. 8. Any regulatory determination necessary to particular relief can be addressed through the order's scope and conditions, with appropriate security and modification as the ICC acts. The Court can thus preserve the practical value of adjudication while respecting the ICC's authority. Allowing the Project to be irretrievably dismantled in the meantime would risk making a favorable judicial or administrative decision precisely the empty victory that preservation relief exists to prevent.

### B. Customer Will Suffer Harm Absent Relief and Has No Adequate Remedy

ComEd does not engage with Customer's explanation that, absent relief, the Project will lose its path to service and the business opportunity that depends on it. Br. 14-15. Instead, ComEd raises four objections. Opp. 11-13. Each fails.

*First*, ComEd argues that Customer harm is "self-inflicted" because Customer could have paid the 2029 security amount under protest. Opp. 11. This is classic bully-monopoly mentality and ignores reality. ComEd calls for Customer to abandon its contractual rights and give up over half a billion dollars nearly three years earlier than the TSA requires, in the face of shifting threats and no timeline. Worse, paying the additional retail deposits would still not resolve ComEd's threatened termination. ComEd expressly reserved the right to terminate the Application based on the disputed TSA default and apply the deposits to cancellation costs. AC, Ex. 4. Customer faced

paying an additional $26.45 million without securing continued development beyond the dispute-resolution process, or withholding payment and facing cancellation for that reason. AC ¶ 26. Customer remains ready, willing, and able to provide properly supported retail deposits; it objects to ComEd's use of those deposits to impose the consequences of a disputed TSA default. AC ¶ 55.

*Second*, ComEd asks what this relief could "practically" accomplish. Opp. 11-12. It would preserve a commercially viable path for the Project to proceed. Since FERC rejected cancellation of the TSA, ComEd remains bound by the TSA. AC, Ex. 14. As much as ComEd wants to act as if that does not matter, it does: ComEd must undertake Project Development and use commercially reasonable efforts to meet the requested Commercial Operation Date and Load and Phasing Schedule, subject to the TSA's conditions and applicable tariffs. TSA §§ 3(D), 4(A), 8.

Customer is ready, willing, and able to satisfy when required to do so, all conditions required for the Project so it can proceed. This includes the land, the workers, the necessary approvals, the equipment, the power supply, the end-users, and the personnel. Customer has suitable, willing, and capable tenants for the Project. AC ¶ 54. Customer also can procure for ComEd the GIS circuit breakers more quickly than ComEd says it can obtain them on its own. AC at ¶ 24 n.6; Br. 6 n.6; Fleit Decl. ¶ 8.

*Third*, the procedural history does not support ComEd's claim of Customer delay. Opp. 12–13. Customer vigorously and expeditiously pursued relief while ComEd worked to evade any analysis on the merits. Customer used the TSA's dispute-resolution process through July 17, filed suit seeking declaratory and injunctive relief on July 20, and moved for a preliminary injunction the same day. Br. 11; Opp. 12. Customer regularly then sought relief, and ComEd worked to evade any substantive review. Indeed, it was ComEd's repeated (and incorrect) insistence that FERC would undertake this dispute that caused much of the delay. *See e.g.,* ECF No. 14-1 at 7-10; Rizzo

Decl., Ex. 3, Aug. 24 Hr'g. Tr. at 18:5-7 ("[S]o I think our view is all of that should to FERC in the first instance"). Both parties conceded to wait on FERC's decision before determining how the litigation should proceed. Rizzo Decl., Ex. 4, Sept. 1 Hr'g Tr. 4:12–24. FERC then rejected cancellation of the TSA, and Customer renewed its request for preliminary relief after the very first hearing after that decision. ECF No. 104. FERC's intervening decision, together with the evidence of the Project's continuing feasibility, provides the basis for relief now.[5]

*Finally*, availability of a damages claim does not establish that damages would adequately remedy the threatened loss. The harm described extends to the loss of its planning position, customer relationships, and the commercial opportunity dependent on timely service from the only utility capable of providing it. Br. 14–15. A later award cannot restore those advantages, and their loss cannot readily be measured by reimbursing expenditures or calculating lost profits.

### C. Balance of Hardships and the Public Interest Favor Customer

ComEd has failed to show that the historic benefits the Project could bring to Joliet and the State are overcome by any of the purported "risks" to customers, PJM, or existing projects ComEd identifies. Br. 15; Opp. 13-15. Each of those risks is securable, speculative, or the product of ComEd's own choices, and the Court can tailor relief to avoid the rest. The balance of hardships weighs firmly in Customer's favor.

**Customers**: ComEd has failed to show why the requested relief would "impose hundreds of millions of dollars of unsecured risk" if ComEd complied with the TSA. Opp. 13. Yet, ComEd itself quantified engineering and construction costs as just over $19 million, which could easily be

[5] Customer's statement withdrawing its TRO motion reflected its assessment at that time. ECF No. 94 at 1. Customer expressly reserved the right to seek future injunctive relief as circumstances warranted. *Id.* FERC's subsequent rejection of cancellation and the evidence supporting a continuing path forward warrant consideration of the present request on its current factual basis.

secured by a bond required by the Court, revisited as necessary as the Project proceeds. AC, Ex. 8 ($13,358,910.29 total investment in 345kV lines plus a deposit of $5,642,059.73 for transmission system impact and design engineering). ComEd has not identified why ratepayers would bear any of those costs, when under TSA § 6(A), ComEd's commitment to seek rate recovery depends on the load materializing, and FERC declined to prejudge cost recovery when it accepted the TSA. *Commonwealth Edison Co.*, 194 FERC ¶ 61,183 at PP4, 14, 31 (2026).

**PJM**: PJM continues to show the Project is "active." Rizzo Decl., Ex. 1. ComEd's argument that Customer would spread "unsecured risk" across PJM (Opp. 13) is unsupported by the TSA or any evidence from PJM. ComEd's assertion that including the Project in the forecast "could . . . force PJM to procure unneeded electrical supplies in its upcoming auction" (*id.* at 14) rests on a premise PJM's own rules do not support. Under PJM Manual 19, a large-load is considered for "inclusion in the forecast period covered by an RPM Auction" if it is "Firm," meaning it has an electric service obligation, a construction commitment, or a long-term supply commitment, "plus a financial commitment (such as credit/collateral support or infrastructure investment)." Rizzo Decl. Ex. 2, PJM Manual 19, Rev. 39 (eff. June 30, 2026), Attach. B. Submissions not meeting that definition are categorized as Non-Firm and may be discounted or shifted to forecast periods not covered by an auction. *Id.* PJM verifies each request, may obtain independent third-party review with uncertainty bands, and "may make adjustments to load adjustment requests if inconsistent with this research and not substantiated by additional data." *Id.* ComEd identifies no mechanism by which an injunction would bypass that screening. Furthermore, the forecast remains open until November/December of this year. *Id.*

PJM incremental auctions exist to true up purchases to reflect need. *Id.* And because PJM publishes a new load forecast each January, a load added or removed after one forecast is reflected

in the next, and incremental auctions adjust procurement to actual need. *Id.* §§ 3.1, 3.2, Attach. B. Nor did PJM independently assess the Project. PJM allegedly excluded it after ComEd told PJM that ComEd "does not consider it a high probability project." ECF No. 81 ¶ 29 & Ex. E. PJM can revise any such determination in the current forecast cycle or later ones. Manual 19, Attach. B; *id.* § 3.1. PJM's procedures provide safeguards against ComEd's claimed risks.

**Existing Projects**: The purported "delays" to existing projects tie to ComEd's own decisions. It could simply proceed with this Project. The delays ComEd describes come from its own preference to retool Cluster 2 without the Project in September. ECF No. 116-1 ¶¶ 57, 59. This is both empty and self-inflicted. There is no basis for putting the Project in any particular cluster and, regardless, ComEd chose to proceed on the premise that the TSA would be cancelled, which FERC later rejected. AC Ex. 14. ComEd took the risk that its choices would be undone. Br. 11-12. That risk can be secured and it is no reason to deny relief.

**Public interest.** The Project's public benefits are undisputed. Br. at 1-2, 15. The everyday people, students, and workers of Joliet, Will County, and Illinois will be deprived of an opportunity that will not come again. Nothing will replace what this Project would bring. ComEd does not contest that the Project is expected to create up to 10,000 construction jobs and 700 permanent positions, to revitalize an underserved and willing community with property tax revenue, contributions to education, and the community. A damages judgment years from now cannot return any of these benefits because the Project's planning position, suppliers, tenants, and workforce will have disappeared.

The public interest also favors holding a monopoly utility to the terms of a FERC-accepted contract that the utility drafted. If ComEd believes those terms are inadequate, its recourse is a prospective filing under the Federal Power Act, subject to TSA § 7(C)(b), not unilateral action.

## CONCLUSION

WHEREFORE, for the reasons herein, Customer respectfully requests that the Court enter a preliminary injunction, and grant such other and further relief as the Court deems just and proper.

Dated: October 19, 2026

Respectfully submitted,

POWERHOUSE HILLWOOD HOLDING LLC

By: *<u>/s/ Randall H. Miller</u>*
One of Its Attorneys

ARNOLD & PORTER KAYE SCHOLER LLP
Randall H. Miller
David S. Jelsma*
1144 Fifteenth Street, Suite 3100
Denver, Colorado 80202
Tel: (303) 863-1000
Email: randy.miller@arnoldporter.com
Email: david.jelsma@arnoldporter.com

John F. Hagan, Jr.
Stephanna F. Szotkowski, *pro hac vice*
Nicholas Zebrowski*
Owen Haney*
Nikolas Bindi*
300 North LaSalle Drive, Suite 3500
Chicago, Illinois 60654
Tel: (312) 583-2300
Email: john.hagan@arnoldporter.com
Email: stephanna.szotkowski@arnoldporter.com
Email: nicholas.zebrowski@arnoldporter.com
Email: owen.haney@arnoldporter.com
Email: nikolas.bindi@arnoldporter.com
Firm I.D. No. 64860

**Pro hac vice forthcoming*

# CERTIFICATE OF SERVICE

I, Randall H. Miller, one of the attorneys for Plaintiff PowerHouse Hillwood Holding LLC, hereby certify that on October 19, 2026, I caused the foregoing **PLAINTIFF'S REPLY IN FURTHER SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** to be filed through the CM/ECF system of the United States District Court for the Northern District of Illinois thereby serving all counsel of record electronically.

By: *<u>/s/Randall H. Miller</u>*

Randall H. Miller